# EXHIBIT F

1          IN THE DISTRICT COURT OF THE UNITED STATES

2             FOR THE EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4

5   ROBERT HUFF,

6               Plaintiff,

7          vs.                    Case No. 17-13556

8                                 Hon. Sean F. Cox

9                                 Magistrate Elizabeth Stafford

10  VELO ASSOCIATES, PLC, et al,

11              Defendants.

12  _____

13

14

15       The Deposition of SCOTT RENNER,

16       Taken at 1104 Fuller Avenue, N.E.,

17       Grand Rapids, Michigan,

18       Commencing at 10:23 a.m.,

19       Thursday, June 7, 2018,

20       Before Rebecca L. Russo, CSR-2759, RMR, CRR.

21

22

23

24

25



 1    APPEARANCES:

 2

 3    CURTIS C. WARNER

 4    Warner Law Firm LLC

 5    350 South Northwest Highway

 6    Suite 300

 7    Park Ridge, Illinois 60068

 8    847.701.5290

 9    cwarner@warner.legal

10         Appearing on behalf of the Plaintiff.

11

12    CHARITY A. OLSON

13    KATRINA M. DeMARTE

14    Brock & Scott PLLC

15    2723 South State Street

16    Suite 150

17    Ann Arbor, Michigan 48104

18    734.222.5179

19    charity.olson@brockandscott.com

20    katrina.demarte@brockandscott.com

21         Appearing on behalf of the Defendants.

22

23    ALSO PRESENT:

24    Joshua Kosmerick

25



```
 1        actual data.  I certainly don't remember every single
 2        lawsuit I've ever filed.
 3    Q.  Okay.  Would you agree that there's a lot of lawsuits
 4        that you file?
 5    A.  Me, as in Scott Renner?
 6    Q.  As Scott Renner on the signature block under Velo Law
 7        Office or any other Velo entity.
 8    A.  What is "a lot"?
 9    Q.  Thousands.
10    A.  It's possible.
11    Q.  Okay.  Would there be a way that if somebody were to
12        audit your office, go to your office, would they be
13        able to access through a computer terminal all of the
14        case files that have been placed with Velo office in
15        which a lawsuit had been filed?
16                MS. OLSON:  Objection, form --
17    A.  I mean, I --
18                MS. OLSON:  -- foundation.
19    A.  I don't know.  I don't participate in any of the
20        statistics of the office, so I have no personal
21        knowledge relating to it.
22  BY MR. WARNER:
23    Q.  I'm not asking about statistics.  I'm asking about
24        access to files in the office.  Who has access to the
25        electronic files in the office?
```



1        was; what did they say, what did you say?

2                    MS. OLSON:  Objection, form.

3   A.   I mean, I'm an attorney and they're my client, so I'd

4        have to object as to the confidentiality regarding the

5        conversation.

6   BY MR. WARNER:

7   Q.   Are you objecting under the attorney-client privilege?

8   A.   I am.

9   Q.   Do you have a retainer agreement with Sun Homes?

10  A.   No, just course of dealing.

11  Q.   No written retainer agreement with Sun Homes?

12  A.   Just course of dealing.

13  Q.   Does Velo Law Office have a written retainer agreement

14       with Sun Homes?

15  A.   I can't speak to that.  I don't know.

16  Q.   Okay.  What's your position at Velo Law Office?

17  A.   My position?

18  Q.   Yes.

19  A.   President.  That sounds like a good name.

20  Q.   Okay.  And as president of Velo Law Office, who

21       contracts with the clients, or is it in writing or is

22       it just all oral contracts and course of dealing with

23       all the clients at Velo Law Office?

24                    MS. OLSON:  Objection as to form, as well

25       as foundation.



1    A.    My involvement is a little bit of everything.

2    BY MR. WARNER:

3    Q.    Okay.

4              MR. WARNER:  Can you repeat the question,

5         please?

6              (The following portion of the record was

7              read by the reporter at 10:54 a.m.:

8              "Q. And as president of Velo Law Office,

9              who contracts with the clients, or is it in

10             writing or is it just all oral contracts

11             and course of dealing with all the clients

12             at Velo Law Office?")

13   BY MR. WARNER:

14   Q.    Okay, who at Velo Law Office is responsible for

15        contracting with clients?

16   A.    You mean who from our office is the one who says,

17        "Yes, we'll do this"?

18   Q.    Who is -- who has authority at Velo Law Office to

19        enter into contracts with the clients?

20   A.    Me.

21   Q.    Okay.  And do you sign contracts to enter into

22        representation agreements with clients?

23   A.    I do.

24   Q.    And in this case you're saying that you have not

25        entered into any contract in writing with Sun Homes,



1         correct?
2    A.   Personally, no.
3    Q.   Okay.  And is it also correct that there is no written
4         contract between Velo Law Office and Sun Homes?
5    A.   I can't speak to that.  I don't, I don't know.
6    Q.   Okay.  Have you looked in Velo Law Office's files to
7         see whether or not there is a contract between Sun
8         Homes and Velo Law Office?
9    A.   I have not, in memory.
10   Q.   Okay.  Do you know that that has been asked of you, of
11        Velo Law Office in discovery?
12   A.   I can't -- I'm not sure what the discovery stuff says.
13   Q.   Okay.  You haven't any idea that, whether or not even
14        plaintiff has issued any discovery in this lawsuit, in
15        the federal lawsuit?
16   A.   I have no recollection as to what the discovery says.
17   Q.   Okay.  Do you know if any has been issued by plaintiff
18        in this federal lawsuit?
19   A.   I do.
20   Q.   Okay.
21   A.   I read them.  I just don't remember what they said.
22   Q.   Okay.  Can you tell me what Exhibit, we marked as
23        Exhibit D is?
24   A.   It looks like an account detail report from our
25        office.



1    A.    I still can't.

2    Q.    During 2017?

3    A.    Still can't.

4    Q.    Currently?

5    A.    Can't.  I don't see every single complaint.

6    Q.    Okay.  What did you -- did you help in the drafting of

7          this complaint, I mean personally, other than the

8          templates, or did it just become populated?

9    A.    I don't understand.  I mean, I created the template.

10   Q.    Okay, created the template, okay.  And then how does

11         the template become populated with numbers, for

12         example, such as $14.52?

13   A.    You take the mouse and you go to print, and then you

14         say "put on list" -- actually, excuse me, you put --

15         you select a document, you hit image.  It pops up and

16         you hit I think just "okay," and it puts it on a print

17         list, and then they print it off.

18   Q.    So it automatically, then, becomes populated by just

19         hitting print?

20   A.    By the data in the software.

21   Q.    By the data, okay.

22   A.    I'm under that impression, for the most part.

23   Q.    Okay.  So what do you do before such a complaint on

24         behalf of Sun Homes is printed out?

25   A.    Review the exhibits before deciding -- basically, the



```
 1        client packet to decide what exhibits we want to use,
 2        if they're appropriate exhibits, if they -- if the
 3        data on them lines up to what was stated, and then
 4        those exhibits go in and everything actually gets
 5        prepared.
 6               And then before signing, we pull up the
 7        account and look at the fields as entered and the
 8        complaint and verify that the pertinent information
 9        looks correct and that the documents as imaged to the
10        system.
11   Q.   And how long as to you, of your involvement, prior to
12        the complaint being filed, how long does that take --
13   A.   I can't say.
14   Q.   -- approximately?
15   A.   I mean, some only a couple minutes and some, I mean,
16        indefinitely.  Some get rejected.
17   Q.   Okay.  What about the -- I mean, do you have any
18        knowledge of doing any review of any documents
19        regarding the complaint filed against Mr. Huff?
20   A.   I can say that the fact that that label is on there
21        means that I did.
22   Q.   And the word exhibit?
23   A.   No, where they have the barcode in the top right-hand
24        corner, that one.  When they enter the account into
25        our system, they print off a label.  That label then
```



 1          gets paperclipped to the, we'll call it client packet.
 2          The client packet goes into a bin, which every evening
 3          I go in, review the packets to make sure that the data
 4          provided by the client itself is appropriate, and then
 5          I go through the packet, decide what I believe should
 6          be the exhibits.  I put that label on -- basically, I
 7          split it up into what I believe should be exhibits.
 8                     I put that label in the top right-hand
 9          corner, and then I put it into a bin that gets imaged
10          the following morning, and that barcode automatically
11          attaches it to the account and names it complaint
12          exhibits so that they can properly be attached to the
13          complaint when printed.
14     Q.   Okay.  If you turn back one page from that there, it
15          says "Sun Homes, Account Holders, Statement of
16          Account."  Do you see that?
17     A.   Correct.
18     Q.   What is this document?
19     A.   That's the basic summary of the balance.
20     Q.   Okay.  And where does this summary come from?
21     A.   The data as provided from the client.
22     Q.   Okay.  So is this -- when you were doing the print
23          thing you discussed, is that also then printed out at
24          the same time as the complaint?
25     A.   This?



1    Q.   Yes.

2    A.   Yes.

3    Q.   The statement of account.

4    A.   Yes, it should be.

5    Q.   Okay.  And so the first time that the debtor is going

6         to receive the statement of account is when they get

7         served with the complaint, correct?

8                   MS. OLSON:  Objection, form, foundation.

9    A.   Right.  I mean, Mr. Huff, the debtor, most likely -- I

10        mean, it depends on the account, but with Sun Homes,

11        yes, that would be the first time he would receive

12        this.

13   BY MR. WARNER:

14   Q.   And what we had marked as Exhibit C, do you know what

15        the document that we have marked as Exhibit C is?

16   A.   Do I know what it is?

17   Q.   Yes.

18   A.   A final statement of security deposit account.

19   Q.   Is this a document that you would have reviewed prior

20        to printing out the complaint, Sun Homes versus

21        Robert E. Huff?

22   A.   Absolutely.

23   Q.   Okay.  And so you would have noticed, then, that the

24        client was representing to you, as you say, Sun Homes

25        is your client, the date paid through 6-30-2011; would


US LEGAL SUPPORT
The Power of Commitment™

```
 1    A.    Offhand?  Tell me their venue right now.

 2    Q.    Isn't that --

 3    A.    Exactly, no.

 4    Q.    Can you answer my question, please?

 5    A.    I already did.

 6    Q.    No, you didn't.

 7    A.    I said no.

 8    Q.    Okay.  So you as a -- you're a debt collector,

 9          correct, that's what you do, you collect consumer

10          debts?

11    A.    I'd like to think of myself as an attorney.

12    Q.    Can you answer the question, please?

13                    MS. OLSON:  He just did.

14    BY MR. WARNER:

15    Q.    Are you a, are you a debt collector?

16    A.    I'm a collections attorney, yes.

17    Q.    And you collect debts?

18    A.    I guess.

19    Q.    Amounts owed or allegedly owed, owed to others?

20    A.    I mean, I'm not a collection agency.

21    Q.    But you're a debt collector, right?

22    A.    Yes.

23    Q.    Okay.

24    A.    I guess.

25    Q.    And isn't one of the requirements under the Fair Debt
```

